William H. HAMER, Harold C. Rosemond, Robert L. Johnson, Roger G. Hodo and Memphis Hodo, Jr., Individually and as members of the class of persons similarly situated, Plaintiffs,

v.

CITY OF ATLANTA, the Department of Public Safety of the City of Atlanta, Maynard H. Jackson, Individually and in his capacity as Mayor of the City of Atlanta, A. Reginald Eaves, Individually and in his capacity as Commissioner of Public Safety and P. O. Williams, Individually and in his capacity as Director of the Bureau of Fire Services, severally and jointly, Defendants,

International Association of Firefighters, Local 134, Intervening Defendants.

UNITED STATES of America, Plaintiff,

v.

CITY OF ATLANTA, a Municipal Corporation, A. Reginald Eaves, Public Safety Commissioner of the City of Atlanta, Department of Public Safety, P. O. Williams, Chief, Atlanta Fire Department, Atlanta Fire Department, Defendants,

International Association of Firefighters, Local 134, Intervening Defendants.

Civ. A. Nos. C75–1809A and C75–2315A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 16, 1978.

Antonio L. Thomas, Atlanta, Ga., for plaintiffs in Civ.A.No. C75–1809A.

Ferrin Y. Mathews, City Atty., Isabel Webster, Mary C. Cooney, Asst. City Attys., Atlanta, Ga., for City defendants in Civ.A. Nos. C75–1809A and C75–2315A.

Warren S. Shulman, Atlanta, Ga., for intervening defendants Intern'l Assn. of Firefighters, Local 134, Baker, Gragg and Whitehead.

James S. Angus, Dept. of Justice, Civ. Rights Div., Washington, D. C., for plaintiff in Civ.A.No. C75–2315A.

## FINDINGS OF FACT

MOYE, District Judge.

1. On September 3, 1975, William H. Hamer and the other individual plaintiffs herein filed the above-captioned complaint against the City of Atlanta and others, alleging patterns and practices of racial discrimination concerning promotional procedures within the Atlanta Bureau of Fire Services.

2. On December 1, 1975, a similar suit was filed by the plaintiff United States of America against the same defendants naming as an additional defendant the International Association of Firefighters, Local 134.

3. On January 28, 1976, the Court ordered both complaints consolidated for all purposes.

4. On May 5, 1976, the defendant City of Atlanta moved the Court to enter a Partial Consent Decree, a copy of which is attached to this order as Exhibit A, which had theretofore been agreed upon by the City, the individual plaintiffs and the United States of America, but not by Local 134.

5. At all times since the filing of the above-captioned complaints, the Mayor and Commissioner of Public Safety of the City have been black. The change from a white administration to a black administration occurred in 1973–74, the black Mayor being elected in the former year, the black Commissioner of Public Safety being appointed in the summer of 1974.

6. The following chart is compiled from Exhibit III (a 1970 Bureau of the Census Report) of defendant Local 134's brief in opposition to the motion for entry of partial consent decree:

|  | City of Atlanta | SMSA |
|---|---|---|
| Total male workforce | 160,223 | 445,500 |
| Male managers and administrators | 12,073 | 50,952 |
| Black male workforce | 72,102 | 87,694 |
| Black male managers and administrators | 1,664 | 1,995 |
| % black managers and administrators | 13.8% | 3.9% |

7. The following table shows the current (as of June 30, 1976) racial mix, by position, within the ABFS:

| Classification | White # | White % | Black # | Black % | Total | Vacancies |
|---|---|---|---|---|---|---|
| Director | 1 | 100.0 |  |  | 1 |  |
| First Deputy Chief | 1 | 100.0 |  |  | 1 |  |

| Classification | White # | White % | Black # | Black % | Total | Vacancies |
|---|---|---|---|---|---|---|
| Deputy Chiefs | 2 | 100.0 | | | 2 | 1 |
| Battalion Chiefs | 16 | 100.0 | | | 16 | 2 |
| Captains | 108 | 100.0 | | | 108 | 9 |
| Lieutenants | 73 | 93.5 | 5 | 6.5 | 78 | 11 |
| Dispatchers | 5 | 71.4 | 2 | 28.6 | 7 | 2 |
| Supervisors (misc.) | 10 | 100.0 | | | 10 | 3 |
| Fire Inspectors | 16 | 94.1 | 1 | 5.9 | 17 | 3 |
| Fire Apparatus Operators | 170 | 86.3 | 27 | 13.7 | 197 | 10 |
| Firefighters | 301 | 58.4 | 214 | 41.6 | 515 | 11 |
| Totals | 703 | 73.8 | 249 | 26.2 | 952 | 52 |

8. As of June 30, 1976, there were 952 persons employed in uniformed divisions of the ABFS of whom 703 (73.8 percent) were white and 249 (26.2 percent) were black.

9. As of June 30, 1976, there were 233 persons occupying promotional ranks (excluding Dispatchers and Fire Apparatus Operators) within the ABFS, of whom 227 or 97.4 percent were white and six or 2.6 percent were black.

10. As of June 30, 1976, there were 437 persons occupying promotional ranks (including Dispatchers and Fire Apparatus Operators) within the ABFS, of whom 402 or 92.0 percent were white and 35 or 8.0 percent were black.

11. In 1973, the promotion system consisted of the following for the position of lieutenant:

Written examination 50%
Training School Average 25%
Oral Interview 25% – only the top 20 candidates are admitted to this portion of the selection process

Candidates had to receive a 70 in each part in order to be eligible to continue. Candidates were awarded one-half point for each year over five years of service up to a maximum of five points. The top 20 candidates were then ranked on an eligible list. If this list of 20 were exhausted, then the next 20 candidates would be interviewed and ranked.

12. In 1969, the first black firefighters, having served for five years in that position, became eligible to compete for the position of lieutenant.

13. Between April 24, 1969, and January 17, 1974, there were 82 promotions to the rank of lieutenant, of which 78 or 95.1 percent went to white firefighters and four or 4.9 percent went to black firefighters. No promotions have been made to this position since January 17, 1974.

14. The position of fire investigator carries the equivalent of a lieutenant's rank and blacks first became eligible to compete for this position in 1969. Between February 13, 1969, and December 27, 1973, there were 15 promotions to the position of fire investigator, of which 13 or 86.7 percent went to white firefighters and two or 13.3 percent went to black firefighters. No promotions have been made to this position since December 27, 1973.

15. Thus, of the 97 promotions to lieutenant since blacks became eligible for that position, 91 or 93.8 percent went to whites and six or 6.2 percent went to blacks.

16. No black employee of the ABFS has ever occupied a rank higher than lieutenant. Under traditional selection standards, blacks first became eligible for promotion to the rank of captain in 1973. At that time, two blacks competed for captain but neither ranked high enough to be promoted under traditional selection procedures. Under traditional selection standards, no black has ever become eligible for any promotional position above the rank of captain.

17. The following reflects the performance of whites and blacks on the 1969, 1971, 1972 and 1973 lieutenant promotional competitions:

## AVERAGE SCORES FOR LIEUTENANT EXAMS

|  | 1969-70 | 1971 | 1972 | 1973 |
|---|---|---|---|---|
| **Written** | | | | |
| White: | 83.28 (147) | 71.46 (123) | 74.55 (145) | 78.54 (118) |
| Black: | 67.17 ( 6) | 65.65 ( 17) | 68.85 ( 33) | 70.02 ( 47) |
| **Training School** | | | | |
| White: | 79.29 (147) | 78.43 (123) | 79.92 (145) | 87.98 (118) |
| Black: | 71.93 ( 6) | 73.77 ( 17) | 76.23 ( 33) | 82.03 ( 47) |
| **Total Score** | | | | |
| White: | 60.46 (147) | 58.03 (123) | 59.00 (145) | 63.02 (118) |
| Black: | 51.96 ( 6) | 52.14 ( 17) | 54.19 ( 33) | 56.46 ( 47) |
| **Oral Interview** | | | | |
| White: | 79.24 (47) | 78.88 (19) | 80.11 (20) | 77.77 (19) |
| Black: | 74.65 ( 2) | 82.36 ( 1) | 00.00 ( 0) | 84.28 ( 1) |
| **Final Score** | | | | |
| White: | 86.01 (47) | 86.24 (19) | 89.49 (20) | 92.44 (19) |
| Black: | 74.48 ( 2) | 87.48 ( 1) | 00.00 ( 0) | 94.86 ( 1) |
| **Seniority Points** | | | | |
| White: | 3.05 (147) | 2.69 (123) | 1.75 (145) | 1.75 (118) |
| Black: | .39 ( 6) | .88 ( 17) | .74 ( 33) | .94 ( 47) |

18. Forty-two persons were promoted to lieutenant from the 1969 promotion list. Of this number, 34 were promoted according to their rank order on the eligible list and of these 34, all were white. In 1969, battalion chiefs were permitted to select their aides from the lieutenant's list as long as the person selected had received a total score of at least 70. Under this procedure, another eight lieutenants were promoted out of rank order who would not ordinarily have been reached. Of these eight, two were black. There were a total of 11 lieutenants promoted under this aide procedure, but three had final scores which would have allowed them lieutenant promotions in rank order without being selected as aides.

19. Eight persons were promoted to lieutenant from the 1971 promotion list. Of this number, six were white and one was black. All were selected in rank order.

20. Fifteen persons were promoted to lieutenant from the 1972 promotion list, of whom all were white. All were selected in rank order.

21. Seventeen persons were promoted to lieutenant from the 1973 promotion list. Of

this number, 16 were white and one was black.

22. As a result of the 1969, 1971, 1972 and 1973 selection processes for the position of lieutenant (excluding fire investigator), only four of 103 or 3.9 percent of the black candidates received promotions to lieutenant as compared with 78 of 533 or 14.6 percent of the white candidates.

23. Local 134 of the International Association of Firefighters has no collective bargaining agreement with the City of Atlanta or the ABFS.

24. The following chart reflects the pass/fail performance of whites and blacks on the lieutenant written examinations administered in 1969, 1971, 1972 and 1973:

CONTENTS: WHITE-BLACK BREAKDOWN ON FIRE BUREAU WRITTEN EXAM FROM 1969 THRU 1973 (REVISED)

WHITE EMPLOYEES

| Year | Took Exam | Passed | Failed | % Passed | % Failed |
|------|-----------|--------|--------|----------|----------|
| 69-70 | 147 | 124 | 23 | 84.35% | 15.65% |

BLACK EMPLOYEES

| Year | Took Exam | Passed | Failed | % Passed | % Failed |
|------|-----------|--------|--------|----------|----------|
| 69-70 | 6 | 2 | 4 | 33.33% | 66.67% |

WHITE EMPLOYEES

| Year | Took Exam | Passed | Failed | % Passed | % Failed |
|------|-----------|--------|--------|----------|----------|
| 1971 | 123 | 74 | 49 | 60.16% | 39.84% |

BLACK EMPLOYEES

| Year | Took Exam | Passed | Failed | % Passed | % Failed |
|------|-----------|--------|--------|----------|----------|
| 1971 | 17 | 5 | 12 | 29.41% | 70.59% |

WHITE EMPLOYEES

| Year | Took Exam | Passed | Failed | % Passed | % Failed |
|------|-----------|--------|--------|----------|----------|
| 1972 | 145 | 95 | 50 | 65.52% | 34.48% |

BLACK EMPLOYEES

| Year | Took Exam | Passed | Failed | % Passed | % Failed |
|------|-----------|--------|--------|----------|----------|
| 1972 | 33 | 17 | 16 | 51.52% | 48.48% |

WHITE EMPLOYEES

| Year | Took Exam | Passed | Failed | % Passed | % Failed |
|------|-----------|--------|--------|----------|----------|
| 1973 | 118 | 80 | 38 | 67.80% | 32.20% |

### BLACK EMPLOYEES

| Year | Took Exam | Passed | Failed | % Passed | % Failed |
|------|-----------|--------|--------|----------|----------|
| 1973 | 47 | 23 | 24 | 48.94% | 51.06% |

### TOTALS

#### WHITE EMPLOYEES

| Took Exam | Passed | Failed | % Passed | % Failed |
|-----------|--------|--------|----------|----------|
| 533 | 373 | 160 | 70.00% | 30.00% |

#### BLACK EMPLOYEES

| Took Exam | Passed | Failed | % Passed | % Failed |
|-----------|--------|--------|----------|----------|
| 103 | 47 | 56 | 45.63% | 54.37% |

25. The following chart represents the pass/fail rates of whites and blacks of comparatively equal seniority on the 1969, 1971, 1972 and 1973 lieutenant written exams:

### THE TOTAL NUMBER OF BLACKS AND WHITES WITH SENIORITY DATED 4/1/63 OR LESS WHO TOOK, PASSED AND FAILED THE LIEUTENANTS EXAM (REVISED)

#### 1973

|  | Took Exam | Passed | Failed | % Passed | % Failed |
|--|-----------|--------|--------|----------|----------|
| Whites: | 85 | 62 | 23 | 72.94% | 27.06% |
| Blacks: | 47 | 23 | 24 | 48.94% | 51.06% |

#### 1972

|  | Took Exam | Passed | Failed | % Passed | % Failed |
|--|-----------|--------|--------|----------|----------|
| Whites: | 91 | 56 | 35 | 61.54% | 38.46% |
| Blacks: | 33 | 17 | 16 | 51.52% | 48.48% |

#### 1971

|  | Took Exam | Passed | Failed | % Passed | % Failed |
|--|-----------|--------|--------|----------|----------|
| Whites: | 43 | 27 | 16 | 62.79% | 37.21% |
| Blacks: | 17 | 5 | 12 | 29.41% | 70.59% |

#### 1969-70

|  | Took Exam | Passed | Failed | % Passed | % Failed |
|--|-----------|--------|--------|----------|----------|
| Whites: | 17 | 13 | 4 | 76.47% | 23.53% |
| Blacks: | 6 | 2 | 4 | 33.33% | 66.67% |

|         | TOTALS   |        |        |          |          |
| ------- | -------- | ------ | ------ | -------- | -------- |
|         | Took Exam | Passed | Failed | % Passed | % Failed |
| Whites: | 236      | 158    | 78     | 67.00%   | 33.00%   |
| Blacks: | 103      | 47     | 56     | 45.63%   | 54.37%   |

26. Of 24 promotions to equally tenured whites and blacks since 1969, four or 16.7 percent went to blacks and 20 or 83.3 percent went to whites. During this same period of time, blacks accounted for 30.4 percent (103/339) of the equally tenured applicants and whites accounted for 69.6 percent (236/339).

27. As among equally tenured whites and blacks with respect to the 1969, 1971, 1972 and 1973 lieutenant promotional exams, 8.5 percent (20/236) of the white candidates were promoted as compared with 3.9 percent (4/103) of the black candidates.

28. The following chart shows the average time of service with the ABFS prior to promotion to the designated ranks:

| | |
| --- | --- |
| Battalion Chief | approx. 20 years 11 months |
| Captain | approx. 16 years 5 months |
| Lieutenant (white) | approx. 13 years 7 months |
| Lieutenant (black) | approx. 7 years 4 months |

29. The following chart shows the number of firefighters, by race, who have been appointed to the ABFS since 1968:

|      | BLACK  |         | WHITE  |         |       |
| ---- | ------ | ------- | ------ | ------- | ----- |
| Year | Number | Percent | Number | Percent | Total |
| 1968 | 64     | 42.4%   | 87     | 57.6%   | 151   |
| 1969 | 73     | 43.5%   | 95     | 56.5%   | 168   |
| 1970 | 48     | 39.0%   | 75     | 61.0%   | 123   |
| 1971 | 28     | 50.9%   | 27     | 49.1%   | 55    |
| 1972 | 78     | 53.8%   | 67     | 46.2%   | 145   |
| 1973 | 49     | 50.0%   | 49     | 50.0%   | 98    |
| 1974 | 9      | 37.5%   | 15     | 62.5%   | 24    |
| 1975 | 3      | 75.0%   | 1      | 25.0%   | 4     |

Last 5 years - 1971 through 1975:

51% Black

49% White

Last 8 years - 1968 through 1975:

46% Black

54% White

30. The following chart indicates the county and/or city residences of the employees of the ABFS:

| | BLACK | WHITE | TOTAL |
|---|---|---|---|
| City of Atlanta | 192 | 92 | 284 |
| Banks County | 0 | 1 | 1 |
| Barrow County | 0 | 2 | 2 |
| Bartow County | 0 | 1 | 1 |
| Butts County | 0 | 2 | 2 |
| Carroll County | 0 | 8 | 8 |
| Cherokee County | 0 | 3 | 3 |
| Clayton County | 1 | 112 | 112 |
| Cobb County | 4 | 134 | 138 |
| Coweta County | 0 | 5 | 5 |
| Dawson County | 0 | 2 | 2 |
| DeKalb County | 37 | 109 | 146 |
| Douglas County | 0 | 60 | 60 |
| Fayette County | 0 | 8 | 8 |
| Forsyth County | 0 | 10 | 10 |
| Fulton County | 28 | 76 | 104 |
| Gwinnett County | 0 | 40 | 40 |
| Hall County | 0 | 1 | 1 |
| Haralson County | 0 | 1 | 1 |
| Henry County | 0 | 13 | 13 |
| Jackson County | 0 | 1 | 1 |
| Lamar County | 0 | 1 | 1 |
| Meriweather County | 0 | 1 | 1 |
| Mitchell County | 1 | 0 | 1 |
| Morgan County | 0 | 1 | 1 |
| Newton County | 1 | 3 | 4 |
| Paulding County | 1 | 24 | 25 |
| Pike County | 0 | 1 | 1 |
| Polk County | 0 | 1 | 1 |
| Rockdale County | 0 | 11 | 11 |
| Spalding County | 0 | 1 | 1 |
| Towns County | 0 | 1 | 1 |
| TOTALS | 264 | 726 | 990 |

PERCENTAGES

| | POPULATION | BLACK | WHITE |
|---|---|---|---|
| City of Atlanta | 284 | 68% | 32% |
| Fulton County | 104 | 27% | 73% |
| All other counties | 602 | 7% | 93% |
| SMSA | 824 | 31.6% | 68.4% |

31. At the current time, approximately 29 percent ($^{284}/_{990}$) of the ABFS employees live in the City of Atlanta and 55 percent ($^{550}/_{990}$) live in the five county area (exclusive of the City of Atlanta) of Clayton, Cobb, DeKalb, Fulton and Gwinnett. Of this 29 percent that live in the City of Atlanta, 19 percent are black and ten percent are white.

32. In 1973 the promotion system for the position of fire investigator, which is the equivalent rank of lieutenant, consisted of the following:

| | |
|---|---|
| Written examination | 50% |
| Oral interview | 50% |

In addition, all candidates are awarded one-half point for each year over five years of service up to a maximum of five points. These points are added onto the final score.

33. The following chart reflects the pass/fail performances of whites and blacks on the fire investigator written exams administered in 1969, 1970, 1972 and 1973:

| | WHITES | BLACKS |
|---|---|---|
| 1969 written exam | 9 | 1 |
| Passed | 8 | 0 |
| Failed | 1 | 1 |
| Percent passed | 88.9% | 0.0% |
| | | |
| 1970 written exam | 10 | 5 |
| Passed | 10 | 5 |
| Failed | 0 | 0 |
| Percent passed | 100.0% | 100.0% |
| | | |
| 1972 written exam | 11 | 5 |
| Passed | 11 | 4 |
| Failed | 0 | 1 |
| Percent passed | 100.0% | 80.0% |
| | | |
| 1973 written exam | 14 | 8 |
| Passed | 8 | 1 |
| Failed | 6 | 7 |
| Percent passed | 57.1% | 12.5% |
| | | |
| All exams | 44 | 19 |
| Passed | 37 | 10 |
| Failed | 7 | 9 |
| Percent passed | 84.1% | 52.6% |

34. The following chart reflects the pass/fail performances of whites and blacks of comparatively equal tenure on the fire investigator written exams administered in 1969, 1970, 1972 and 1973:

| | WHITES | BLACKS |
|---|---|---|
| 1969 written exam | 0 | 1 |
| Passed | 0 | 0 |
| Failed | 0 | 1 |
| Percent passed | 0.0% | 0.0% |
| | | |
| 1970 written exam | 2 | 5 |
| Passed | 2 | 5 |
| Failed | 0 | 0 |
| Percent passed | 100.0% | 100.0% |
| | | |
| 1972 written exam | 7 | 5 |
| Passed | 7 | 4 |
| Failed | 0 | 1 |
| Percent passed | 100.0% | 80.0% |

|  | WHITES | BLACKS |  | WHITES | BLACKS |
|---|---|---|---|---|---|
| 1973 written exam | 12 · | 8 | All exams | 21 | 19 |
| Passed | 7 | 1 | Passed | 16 | 10 |
| Failed | 5 | 7 | Failed | 5 | 9 |
| Percent passed | 58.3% | 12.5% | Percent passed | 76.2% | 52.6% |

35. The following chart reflects the performance of whites and blacks on the 1969, 1970, 1972 and 1973 fire investigator exam competitions:

AVERAGE SCORES FOR FIRE INVESTIGATOR

|  | 1969 | 1970 | 1972 | 1973 |
|---|---|---|---|---|
| **Written** |  |  |  |  |
| White: | 76.67 (9) | 78.70 (10) | 79.18 (10) | 73.79 (14) |
| Black: | 66.40 (1) | 74.76 ( 5) | 72.76 ( 5) | 60.76 ( 8) |
| **Oral Interview** |  |  |  |  |
| White: |  | 77.46 (10) | 78.19 (10) | 77.16 (8) |
| Black: |  | 79.29 ( 5) | 77.74 ( 5) | 78.16 (1) |
| **Total Score** |  |  |  |  |
| White: | 80.19 (6) | 78.05 (10) | 78.69 (10) | 78.73 (8) |
| Black: |  | 77.10 ( 5) | 75.25 ( 5) | 74.08 (1) |
| **Seniority Points** |  |  |  |  |
| White: | 3.30 (6) | 2.55 (10) | 1.50 (10) | 1.45 (8) |
| Black: |  | .58 (.5) | 1.35 ( 5) | .96 (1) |
| **Final Score** |  |  |  |  |
| White: | 83.5 (6) | 80.59 (10) | 80.19 (10) | 80.18 (8) |
| Black: |  | 77.69 ( 5) | 76.60 ( 5) | 75.04 (1) |

36. Three persons were promoted to the rank of fire investigator from the 1969 promotion list. Of this number, all were white and all were selected in rank order.

37. Five persons were promoted to the rank of fire investigator from the 1970 promotion list. Of this number, four were white and one was black. All were selected in rank order.

38. Six persons were promoted to the rank of fire investigator from the 1972 promotion list. Of this number, five were white and one was black. All were selected in rank order.

39. One person (white) was promoted to the rank of fire investigator from the 1973 promotion list, and he was selected in rank order.

40. As a result of the 1969, 1970, 1972 and 1973 selection processes for the position of fire investigator, only two of 19 or 10.5 percent of the black candidates received promotions as compared with 13 of 44 or 29.5 percent of the white candidates.

41. The following chart reflects the average scores of whites and blacks of comparatively equal tenure on the 1969, 1970, 1972 and 1973 fire investigator promotional competitions:

AVERAGE SCORES FOR FIRE INVESTIGATOR
AS BETWEEN EQUALLY TENURED WHITES AND BLACKS

| | 1969 | 1970 | 1972 | 1973 |
|---|---|---|---|---|
| **Written** | | | | |
| White: | | 75.1 (2) | 78.23 (7) | 74.93 (12) |
| Black: | 66.4 (1) | 74.76 (5) | 72.76 (5) | 60.76 ( 8) |
| **Oral Interview** | | | | |
| White: | | 76.42 (2) | 77.69 (7) | 77.29 ( 7) |
| Black: | | 79.29 (5) | 77.74 (5) | 78.16 ( 1) |
| **Total Score** | | | | |
| White: | | 75.76 (2) | 77.96 (7) | 79.40 ( 7) |
| Black: | | 77.10 (5) | 75.25 (5) | 74.08 ( 1) |
| **Seniority Points** | | | | |
| White: | | .57 (2) | .67 (7) | .95 (7) |
| Black: | | .58 (5) | 1.35 (5) | .96 (1) |
| **Final Score** | | | | |
| White: | | 76.33 (2) | 78.63 (7) | 80.35 (7) |
| Black: | | 77.69 (5) | 76.60 (5) | 75.04 (1) |

42. As a result of the 1969, 1970, 1972 and 1973 fire investigator promotional competitions, only two of 19 or 10.5 percent of the equally tenured black candidates received promotions as compared with four of 21 or 19.0 percent of the equally tenured white candidates.

43. As a result of the 1969, 1971, 1972 and 1973 promotional competitions for the position of lieutenant and the 1969, 1970, 1972 and 1973 promotional competitions for the position of fire investigator, as among equally tenured whites and blacks, there were a total of 30 promotions of which six or 20.0 percent went to blacks and 24 or 80.0 percent went to whites. Blacks received 20 percent of the promotions as among all equally tenured candidates, and represented 32.2 percent ($^{122}/_{379}$) of the pool of equally tenured applicants. Whites received 80 percent of the promotions as among all equally tenured candidates, and represented 67.8 percent ($^{257}/_{379}$) of the pool of equally tenured applicants. Among

equally tenured black and white candidates for fire lieutenant and fire investigator positions, 9.3 percent ($^{24}$/$_{257}$) of the whites were promoted and 4.9 percent ($^{6}$/$_{122}$) of the blacks were promoted.

44. The following chart shows the average scores of whites and blacks by years of service on the 1969, 1971, 1972 and 1973 lieutenants' examinations:

### TIME IN GRADE TEST SCORE COMPARISON FOR WHITE AND BLACK FIRE BUREAU EMPLOYEES

#### 1973 LIEUTENANT'S EXAMINATION

| Years of Service | Average Black Grade | Average White Grade |
|---|---|---|
| 6 | 52.00 (14) | 74.47 (19) |
| 7 | 72.29 (17) | 80.00 (41) |
| 8 | 85.2 ( 5) | 78.67 (12) |
| 9 | 69.43 ( 7) | 85.41 (12) |
| 10 | 73.00 ( 4) | 84.67 ( 6) |

#### 1972 LIEUTENANT'S EXAMINATION

| Years of Service | Average Black Grade | Average White Grade |
|---|---|---|
| 6 | 68.41 (17) | 73.50 (56) |
| 7 | 83.00 ( 3) | 71.40 (15) |
| 8 | 65.33 ( 9) | 79.08 (13) |
| 9 | 68.00 ( 4) | 76.50 ( 8) |

#### 1971 LIEUTENANT'S EXAMINATION

| Years of Service | Average Black Grade | Average White Grade |
|---|---|---|
| 6 | 69.00 ( 3) | 67.71 (14) |
| 7 | 65.60 (10) | 74.22 (18) |
| 8 | 63.25 ( 4) | 72.63 (11) |

#### 1969 and 1970 LIEUTENANT'S EXAMINATION

| Years of Service | Average Black Grade | Average White Grade |
|---|---|---|
| 6 | 67.16 (6) | 77.77 (18) |

NOTE: THE "YEARS OF SERVICE" COLUMN DROPS PROGRESSIVELY SO AS TO COINCIDE WITH THE SENIORITY DATE OF THE TOP PAID BLACK FIREMAN. THE 1969 and 1970 LIEUTENANT'S EXAMINATION WAS THE FIRST HE WAS ELIGIBLE TO TAKE.

45. The number of black firemen eligible for examination as of June 1, 1976, are as follows:

To rank of captain     -- 6
To rank of lieutenant -- 213

46. In 1968 and 1969 an Officers Training School existed within the Bureau. The purpose of that school was to prepare employees for taking the examinations required for promotion. All Bureau employees had the opportunity to attend the training school. Notice of the training program was advertised in all fire companies.

47. Other than the bare statistics regarding the promotional system for lieutenants, there is no substantial evidence of record to support any claim of discrimination against blacks by the defendant Bureau of Fire Services after the enactment of the Civil Rights Act of 1964.

## CONCLUSIONS OF LAW

1. In considering the question of discrimination, the threshold problem is to determine the appropriate geographical boundaries for comparison purposes. In view of the fact that only 29 percent of the employees of the Atlanta Bureau of Fire Services live within the City of Atlanta itself and 55 percent live in the five-county area (exclusive of the City of Atlanta) comprising the Atlanta Standard Metropolitan Statistical Area—leaving approximately 15-16 percent who live even beyond those boundaries—the Court concludes that for the purposes of the determination necessary in this litigation, the Atlanta Standard Metropolitan District statistics are the most relevant and useful.

Further, the Court has been informed by counsel for plaintiff United States that such statistical district figures are the figures most commonly relied upon in litigation of this sort throughout the nation.

The suggestions by the City and some other parties that figures for the City of Atlanta only should be used were based upon the City's contention that it had by ordinance required City employees to reside within the City limits, but that ordinance was subsequently declared invalid by the Georgia Supreme Court.

2. Since the labor force of the Atlanta Standard Metropolitan Statistical Area is 20.8 percent black (79.2 percent white), and the current racial mix of the Atlanta Bureau of Fire Services (prior to the recent hiring of approximately 100 entry level firemen) was 26.2 percent black, it is clear that there has been no discrimination against blacks in total employment in the Atlanta Bureau of Fire Services.

3. However, as set forth in this Court's Findings of Fact above, there were, as of June 30, 1976, only five black lieutenants (the first direct promotional rank) of a total of 78 lieutenants. These blacks comprised only 6.5 percent of that rank, although it appears that sufficient blacks were eligible experience-wise, and took the written exams, to have increased that percentage—they simply were out-ranked in scores by the white applicants, promotions being by rank order.

No contentions of discrimination are made in this litigation as to the higher promotional ranks. In any event, however, in view of the substantially increased experience required for eligibility and the relatively few blacks competing at the higher ranks, the evidence herein would be insufficient to establish any discrimination against blacks at the rank of captain or higher.

4. The Court therefore concludes that the private plaintiffs adequately represent a class which appropriately may be defined as black employees of the Atlanta Bureau of Fire Services who have been or may be denied promotion to the rank of lieutenant by reason of their scores on a written test administered or to be administered by the defendant Bureau.

5. The written examination used by the defendant Bureau of Fire Services had a racial impact—*i.e.*, screened out blacks at a greater rate than whites—and it was not validated in accordance with EEOC guidelines (*see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

6. The Court has examined carefully the written lieutenants' examination. From such a non-professional examination, it appears to be significantly work-related; however, the City has chosen not to defend that test. The Court's experience in other phases of this case and in the very similar litigation regarding the Atlanta Bureau of Police Services compels the conclusion that such lack of evidentiary support for the written test is not so much because it would have been unsupportable, but because the incumbent City Administration sought to eliminate written, objective testing in favor of subjective methods of hiring and promotion. In other words, the City has in this case virtually defaulted on what could have been a critical issue in the case.

7. While the minimal, purely statistical nature of the discrimination shown on the record would ordinarily give the Court some difficulty in fashioning the appropriate relief, the fact that the City has, in a proposed consent decree submitted to the Court, voluntarily consented to substantially all, indeed more than, the relief the Court would have to order makes the matter of the relief to be granted an easier proposition.

The Court will, therefore, based upon the above Findings and Conclusions, direct such of the relief proposed in the proposed consent decree as seems appropriate. A substantial amount of the relief consented to by the City is not appropriate, as the Court's Findings of Fact indicate. In other words, to permit the full scope of the relief proposed in the proposed consent decree would give the City's black administration a license going far beyond the needs of this case to prefer blacks to whites in support of the City Administration's frequently and vehemently articulated "Affirmative Action" concept.

The Court emphasizes that the relief it grants is not pursuant to its approval of the proposed consent decree, but is based upon the above Findings and Conclusions; and to the extent the provisions of said proposed decree are not incorporated in this order, they are disapproved as inconsistent with the public interest.

The Court will further, in fashioning its remedy herein, take into account the City's request, p. 13 of Reply Brief of June 1, 1977, that, in the event the Court should find that the defendants have discriminated against plaintiffs in some fashion, the Court allow the defendants to submit to it for approval a promotion plan that would satisfy the requirements of Title VII, while at the same time insuring the proper and adequate function of the Atlanta Bureau of Fire Services.

ORDER

1. The City defendants, their officers, officials, agents, employees and successors are hereby permanently enjoined from en-

gaging in any act or practice with respect to employment which has the purpose or effect of unlawfully discriminating against any present or future employee or any applicant or potential applicant for employment with the Atlanta Bureau of Fire Services because of such individual's race.

■ 2. The defendants shall, as a goal, seek to promote blacks to the positions of lieutenant, in sufficient numbers that the present effects of past discrimination shall be eliminated.

Based on the Court's Findings and Conclusions, this one-time goal shall be the promotion of an additional 15 black lieutenants and is based on the personnel mix in effect on March 15, 1976, and should be accomplished within 18 months of the date of this order.

■ As a long range goal, the percentage of black officers should, of course, bear a rough approximation to the proportion of blacks under their command, which should have a rough relationship to the racial mix of the pool of applicants, which, again, should have a rough relationship to the racial mix of the appropriate work force, all of which will be constantly fluctuating, and cannot be pinpointed by the Court at this time. Any serious deviations will be taken care of, however, by this Court's retention of jurisdiction to insure compliance with this order.

3. The goals set forth above shall be accomplished within the framework of a promotional system to be established by the City defendants, subject to the approval of this Court, and the City defendants are directed to submit to the Court within two weeks of the date of this order a promotional plan that will satisfy the requirements of Title VII while at the same time insuring the proper and adequate function of the Atlanta Bureau of Fire Services.

Such plan shall insure the objective evaluation of all applicants for promotion on a comparative basis and shall contain such controls as may be necessary to insure that result.

The Court will be receptive to any proposals to use written examinations of the type used in 1975 for promotion to the position of lieutenant or captain, or any new written tests designed to determine on a comparative basis the relevant qualifications of the applicants.

The plan for promotion shall provide that for a uniformed employee to be eligible for promotion to the rank of lieutenant he shall have three years experience as a firefighter.

4. In order to insure the most qualified officers possible while at the same time effectuating the goals set forth above, the promotion plan may provide for:

(1) Scores to be bracketed in grade units of 5 on a scale of 100;

(2) The selection of an applicant who is a resident of the City of Atlanta over an applicant who is not when both are equally qualified;

(3) The operation of an officers training school as described in this Court's Findings of Fact; and

(4) Such other methods of achieving the desired results as may be suggested by the parties and approved by the Court.

5. The City shall award back pay to the first 15 black applicants becoming lieutenants pursuant to this order, such back pay to be at the rate they would have drawn as lieutenants from the date they last took a fire lieutenants' examination to date of appointment as lieutenant less other pay earned in the interim. Counsel for said applicants shall be entitled to attorneys fees. Counsel shall confer with the attorneys for the City in an attempt to reach agreement on an appropriate fee. If such conference is not successful, counsel shall submit to the Court affidavits in support of their contentions regarding attorneys fees.

6. The defendants shall retain, during the period of this decree, the records listed below. They shall be made available to counsel for all parties for inspection and/or copying upon written request.

a. All applications for positions in the Bureau of Fire Services, including identification of the applicant by race;

b. All scores, whether written or practical, for promotion within the Bureau of Fire Services with the race of each rated applicant;

c. All form letters with a list of addresses and any individual correspondence used by the defendants for promotion within the Bureau of Fire Services;

d. All eligibility lists utilized for promotion in the Bureau of Fire Services with the race of each person.

7. Defendants shall submit to counsel for all parties the following reports:

a. *Annually*: A photostatic copy of the EEO–4 form filed with the Equal Employment Opportunity Commission for the Bureau of Fire Services, within ten (10) days of the filing of such form;

b. Within ninety (90) days of the entry of this order and every six (6) months for the first year following entry of this order and thereafter at dates to be agreed upon by the parties:

(1) Total number of uniformed personnel employed by the Bureau of Fire Services by race within each rank and the total number of personnel by race who entered upon and left each rank during the intervening period since the last report;

(2) Statistical breakdown of the promotion applications made during the intervening period since the last report in terms of race together with a statistical breakdown of the acceptance or rejection of such applications by race;

(3) The name, address and telephone number of any employee who fails to complete a promotional probationary period and the reasons therefor;

(4) Statistics showing promotions by position during the intervening period since the last report by race.

8. The Court shall retain jurisdiction of this action to insure compliance with this order and for such supplemental relief or corrective relief as may be necessary or appropriate upon application by any party to this action.

9. This constitutes a final order with respect to the matters decided herein; however, this order does not concern itself with the question raised by the recent hirings of approximately 100 firemen which is the subject of separate briefing and consideration by the Court.

SO ORDERED, this 16 day of February, 1978.

## EXHIBIT A

UNITED STATES OF AMERICA,
Plaintiff,

v.

CITY OF ATLANTA, a municipal corporation; A. REGINALD EAVES, Public Safety Commissioner of the City of Atlanta; DEPARTMENT OF PUBLIC SAFETY; P. O. WILLIAMS, Director of the Bureau of Fire Services; BUREAU OF FIRE SERVICES; INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 134, Defendants.

WILLIAM H. HAMER, HAROLD C. ROSEMOND, ROBERT L. JOHNSON, ROGER G. HODO, MEMPHIS HODO, JR., Plaintiffs,

v.

CITY OF ATLANTA, et al., Defendants.

Civ. A. Nos. C75–2315A and C75–1809A.

United States District Court,
N. D. Georgia,
Atlanta Division.

May 5, 1976.

PARTIAL CONSENT DECREE

MOYE, District Judge.

The United States and the above-named private parties filed their complaint herein alleging that the defendants were engaged in a pattern or practice of discrimination, based on race, with respect to promotions within the Atlanta Bureau of Fire Services, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Equal Employment Opportunity Act of 1972, the Fourteenth Amendment to the Constitution of the United States, 42 U.S.C. §§ 1981, 1983 and 1985 and 28 U.S.C. §§ 1331 and 1345.

It now appears to the Court that the parties to this Decree have waived hearing and findings of fact and conclusions of law on all issues, and have agreed to the entry of this Order.

The consent of the parties shall in no manner constitute findings on the merits of the case nor be construed as an admission by the defendants of any violation of Title VII, rights guaranteed by the Fourteenth Amendment or 42 U.S.C. §§ 1981 and 1983. Therefore, it is hereby ORDERED, ADJUDGED and DECREED:

## I. GENERAL

1. The defendants, their officers, officials, agents, employees and successors are hereby permanently enjoined from engaging in any act or practice with respect to employment which has the purpose or effect of unlawfully discriminating against any present or future employee or any applicant or potential applicant for employment with the Atlanta Bureau of Fire Services because of such individual's race.

2. The entry of this Decree in no way constitutes an adjudication or finding of such present or past discriminatory employment practice by the defendants.

## II. GOALS

3. The defendants shall, as a long-range goal, seek to promote blacks in sufficient numbers so that the present effects of past discrimination shall have been eliminated.

To meet this long-range goal, the Public Safety Commissioner, in making appointments to the ranks of lieutenant, captain and battalion chief, shall adopt the following interim promotion goals:

a. The Public Safety Commissioner shall seek to achieve the goal of selecting at least fifty-five percent (55%) of all

lieutenant and captain appointments from among qualified black applicants. In achieving this minimum fifty-five percent (55%) goal, the Public Safety Commissioner, in filling current vacancies, shall appoint only qualified members of the affected class as defined in Paragraph 14, *infra.* Thereafter, not less than seventy-five percent (75%) of the promotions made to blacks shall be awarded to members of the affected class until a total of thirty-five (35) members of the affected class have been promoted. Thereafter, this priority for members of the affected class shall cease. This priority reservation for thirty-five (35) members of the affected class is subject to the availability of qualified black firefighters from the affected class who have either previously passed a written examination or who subsequently pass a written examination.

b. For the first five (5) years following the date of entry of this Decree, the Public Safety Commissioner shall seek to achieve the goal of selecting at least thirty-three percent (33%) of all battalion chief appointments from among qualified black applicants. These appointments shall be made so that this goal is achieved at least every eighteen (18) months. After this five (5) year period, the parties shall re-examine this goal for the battalion chief position to determine whether it should be adjusted. If the parties are unable to agree on an appropriate adjustment, they shall present that issue to the Court for resolution.

c. When the long-range goal set out in this paragraph has been reached, these interim promotion goals shall cease.

d. In seeking to achieve these interim promotion goals, the Public Safety Commissioner shall select an employee who is a resident of the City of Atlanta over an employee who is not a resident of the City of Atlanta when both promotional candidates are equally qualified for the position sought.

## III. TESTS

4. The Atlanta Bureau of Fire Services may continue to use written examinations of the type used in 1973 for the positions of lieutenant and captain. These written examinations shall be used only on a pass/fail basis. The passing levels used in 1973 shall continue to be the basis for a pass/fail examination. In the event that any of these examinations screen out a substantially disproportionate number of black applicants on a pass/fail basis, its use shall be suspended until such time as it has been validated in accordance with the Equal Employment Opportunity Commission's *Guidelines on Employee Selection Procedures,* 29 C.F.R. 1607.1, *et seq.,* or such test has been shown to have no discriminatory impact on blacks. Validation as used herein shall include a differential validation study and shall include a demonstration of a statistically significant and positive correlation between test results and a meaningful measure of actual job performance in the positions for which the test purports to examine the knowledge and skills required for the position.

5. In no event shall the examinations referred to in Paragraph 4, *supra,* be considered as a valid basis for failure to meet the interim goals set out in Paragraph 3, *supra.*

6. If the defendants wish to use the results of any other test as the basis for selection and promotion, they shall furnish plaintiffs, at least thirty (30) days prior to its use, a copy of the validation study and any other relevant information concerning the test and its validity. If the plaintiffs agree that the test has been validated in accordance with Paragraph 4, *supra,* the City may thereafter utilize the results of the test. If the parties are unable to agree on the validity of the test, the defendants may submit the issue to the Court for resolution.

## IV. INTERIM PROMOTION PROCEDURES

7. Until such time as the long-range goals of this Decree have been achieved, and consistent with the interim goals set

out in Paragraph 3, *supra,* the defendants shall establish an interim promotion procedure for evaluating candidates for promotion, and for certifying to the Commissioner of Public Safety lists of qualified eligible candidates. The Commissioner of Public Safety shall be responsible for the final selection for each position using the selection procedure of 1 in 5, 2 in 7, 3 in 9.

8. Under the interim promotion procedure, a selection committee shall be established, composed of six (6) members, of whom three (3) shall be white and three (3) shall be black. The initial selection committee of six (6) members shall consist of the following: the Commissioner of Administrative Services, the Director of the Bureau of Fire Services, and four (4) experienced senior level managerial persons from outside the employ of the City of Atlanta, the latter four (4) to be appointed by the Commissioner of Public Safety. The selection committee shall be responsible for establishing one eligible list for each promotion position, and for rank ordering candidates on each list. This initial selection committee shall serve for two years from the date of its appointment. Thereafter, two (2) of the experienced senior level managerial persons shall be selected from among officers in the Atlanta Bureau of Fire Services holding the same or higher rank being examined for, except that this requirement shall be operable only if there are senior officers able and willing to serve; and provided, however, that one of said persons shall be black and one shall be white. In case of tie votes on any issue, the tie will be broken by the Commissioner of Public Safety.

9. The selection committee shall use the following criteria in evaluating and ranking promotional candidates on eligible lists for all promotions:

a. Written examination-25 points. The selection committee shall identify and make available, at least three (3) months prior to any written examination following the initial examination, the manuals from which said examination is to be given;

b. Length of service-25 points;

c. Record review-25 points. The selection committee shall establish objective and clearly defined criteria for what constitutes the record review; and

d. Oral interview-25 points. The oral interview will consist in part of the use of modern assessment techniques which utilize the knowledge involved in the supervision of firefighting.

A combined total score of sixty-five (65) points shall be the minimum passing grade necessary to be eligible for promotion. With respect to the length of service, candidates shall receive five (5) points for each year of service in the Atlanta Bureau of Fire Services up to a maximum of twenty-five (25) points. In the event that any of the criteria set out above results in the screening out of a disproportionate number of black applicants and/or an inability to meet the interim goals set out in Paragraph 3, *supra,* then the selection committee shall cease using such criteria until such time as it has been validated in accordance with the requirements of Paragraph 4, *supra.* If any of the criterion set out above is eliminated, then the selection committee shall rely on the remaining criteria for evaluating and ranking candidates on eligible lists for all promotions. In such event, a combined total of sixty-five percent (65%) shall be the minimum passing grade necessary to be eligible for promotion.

10. The selection committee shall also determine and publish objective and clearly defined criteria to be used in evaluating and ranking battalion chief candidates.

11. All persons who have previously passed a lieutenant written examination administered in 1969, 1971, 1972 or 1973 shall not be required to retake a written examination in order to qualify for promotion to lieutenant. All such persons shall receive twenty-five (25) points.

12. The selection committee shall also be responsible for (a) the administration and grading of all promotional examinations and (b) the posting at all fire stations of all announcements for promotional examinations.

## V. QUALIFICATIONS

13. Except as provided in Paragraphs 15 and 16, *infra,* the following are the years of

service with the Atlanta Bureau of Fire Services that a person must have completed as a uniformed employee in order to be eligible for the designated rank:

Lieutenant — three (3) years experience as a firefighter

Captain — one year as a lieutenant

Battalion Chief — three (3) years as a captain

## VI. SPECIFIC RELIEF

14. There is hereby established an affected class of employees which shall consist of all black firefighters who have unsuccessfully competed for the positions of lieutenant and/or captain. All black firefighters who have passed the written examination portion of the selection process for lieutenant or captain shall be eligible, without further written examinations, to be considered by the selection committee for promotion to the appropriate position. All black firefighters who failed to pass the written examination portion of the selection process for lieutenant or captain shall be tested by the selection committee in accordance with Paragraphs 4 and 9, *supra*. Those black firefighters who successfully passed the written examination portion of the selection process for lieutenant or captain in the past or who successfully complete the selection process set out in Paragraphs 4 and 9, *supra,* shall be placed on the appropriate eligible list after they have been ranked by the selection committee.

15. Members of the affected class who are promoted to the rank of lieutenant shall be eligible for promotion to the rank of captain after three (3) months service in the rank of lieutenant.

16. For the first two (2) year period following the date of the first promotions made pursuant to this Decree, persons having served a minimum of eighteen (18) months in the rank of captain will be eligible for promotion to battalion chief, provided that any persons with under three (3) years in the rank of captain shall have received accelerated training in order to be eligible. Thereafter, the requirements of Paragraph 13, *supra,* shall be used.

17. The issue of whether any member of the affected class is entitled to back pay shall be submitted to the Court on the basis of stipulated facts by the United States and the City of Atlanta simultaneously with the filing of this Decree.

## VII. RECORD KEEPING AND REPORTING

18. The defendants shall retain, during the period of this Decree, the records listed below. They shall be made available to counsel for plaintiffs for inspection and/or copying upon written request.

a. All applications for positions in the Bureau of Fire Services, including on such applications identification of the applicant by race.

b. All scores, whether written or practical, for promotion within the Bureau of Fire Services with the race of each rated applicant.

c. All form letters with a list of addresses and any individual correspondence used by the defendants for promotion within the Bureau of Fire Services.

d. All eligibility lists utilized for promotion in the Bureau of Fire Services with the race of each person.

19. Defendants shall submit to counsel for plaintiffs the following reports:

a. *Annually*: A photostatic copy of the EEO-4 form filed with the Equal Employment Opportunity Commission for the Bureau of Fire Services, within ten (10) days of the filing of such form.

b. Within ninety (90) days of the entry of this order and every six (6) months for the first year following entry of this order and thereafter at dates to be agreed upon by the parties:

(1) Total number of uniformed personnel employed by the Bureau of Fire Services by race within each rank and the total number of personnel by race who entered upon and left each rank during the intervening period since the last report.

(2) Statistical breakdown of the promotion applications made during the intervening period since the last report in terms of race together with a statistical breakdown of the acceptance or rejection of such applications by race.

**790**

(3) The name, address and telephone number of any black employee who fails to complete a promotional probationary period and the reasons therefor.

(4) Statistics showing promotions by position during the intervening period since the last report by race.

## VIII. JURISDICTION

20. The Court shall retain jurisdiction of this action for such supplemental relief or corrective relief as may be necessary or appropriate upon application by any party to this action. Plaintiffs will promptly notify the defendants of any problems of non-compliance with this order which they believe warrant investigation. Defendants shall have thirty (30) days to investigate the complaint and negotiate with the plaintiffs regarding the seeking of any appropriate corrective relief. At the end of this period, the plaintiffs, if not satisfied, may seek an appropriate resolution to the question by the Court.

SO ORDERED, this the 5th day of May 1976.